[No. 61225-1.   En Banc.   October 13, 1994.]

SEA-VAN INVESTMENTS ASSOCIATES, *Respondent*, v. MARVIN HAMILTON, ET AL, *Petitioners*.

*Edwards, Sieh, Wiggins & Hathaway,* by *Charles K. Wiggins; Michael A. Winslow,* for petitioners.

*Preston Gates & Ellis,* by *Jennifer M. Coughlin,* for respondent.

DURHAM, J. — Sea-Van Investments Associates (Sea-Van) brought a suit for specific performance and/or damages against Marvin and Larona Hamilton (Hamilton) and Clare and Virginia Hellyer (Hellyer) to enforce an alleged contract for the sale of land. The trial court granted a motion to dismiss at the close of Sea-Van's case, ruling that no contract had been formed. The Court of Appeals reversed the trial court. It found that a contract was formed, and utilized the disputed legal doctrine of "judicial admissions" to supply a missing material element. We agree with the trial court that there was never a contract formed, and so reverse the Court of Appeals. We leave the viability of the "judicial admissions" doctrine for another day.

Hellyer and Hamilton each own adjoining, undeveloped 10-acre tracts in Section 27 east of Mount Vernon in Skagit County. In 1988, Sea-Van began purchasing property in this section. At that time, Sea-Van was considering a number of different uses for these properties, but it has now begun the permitting process to develop the property into a 27-hole golf course and adjoining residential planned community.

After purchasing the northern half of the section from the Scott Paper Company, Sea-Van began making inquiries of the owners in the southern half of the section regarding the sale of their land. On March 14, 1989, Sea-Van sent Hamilton a letter asking if they were interested in selling their land, and enclosing a section map identifying the land. A similar letter was sent to Hellyer in care of David Syre.[1] On

---

[1] Syre and Hellyer had been in a long-standing partnership which was in the process of dissolving. At the time these letters were sent, it was not clear to Mr. Krefting who was the actual owner of that 10 acres.

April 5, 1989, Sea-Van sent another letter to Mr. Hamilton, which was signed by Paul Krefting, as president of Sea-Van, offering $1,000 per acre for Hamilton's 10-acre tract. The letter ended with a suggestion that Sea-Van could make "a more formal offer with earnest money". Clerk's Papers (CP), at 107. The same offer was also made to Hellyer. Hellyer and Hamilton declined this offer.

Sea-Van continued to express an interest in buying these properties. The Hellyers authorized Marvin Hamilton to negotiate with Krefting on their behalf in order to explore the possibility of a sale. During the summer of 1989, Sea-Van made another offer of $1,500 per acre which was also rejected. Krefting testified that he then asked Hamilton to name an acceptable price.

In early September 1989, Hamilton told Krefting over the phone that $3,000 an acre would be an acceptable price. By letter dated September 11, directed to Marvin Hamilton, Sea-Van made the following offer:

> On behalf of Sea-Van Investments Assoc., I am pleased to make the following offer for the 20 acres owned by you and Clare Hellyer in Section 27, southeast Mount Vernon:
> Two Options:
> A. *$3,000 per acre on terms*: 20% down, balance on an interest-only two-year note at 10% interest p.a.; Buyer & Seller split closing costs. Deed of Trust on closing.
> B. *$2,500 per acre cash* on closing; Buyer pays all closing costs.
> Both options are subject to both 10 acre parcels closing together and to proof of clear title by the Sellers.
> Please consider this offer valid until September 15, 1989.

CP, at 108. There was no deed of trust enclosed with the letter. On September 13, 1989, Hamilton responded to this offer with the following letter to Krefting:

> This letter is to inform you Mr Hellyer and myself do except your offer (A) of $3,000.00 per acre for two 10 acre parcles of land East of Mt Vernon.
> Terms 20% on closing, balance on an interest only two year note at 10% interest paid quarterly.
> On advice from my accountant I do not want closing to accure on my parcel until sometime after the 1st of the year 1990. Mr Hellyer on the other hand has indicated to me they wish to close sooner.

(Spelling and grammar as in original.) CP, at 109.

There is some confusion from the testimony over what occurred next. Krefting testified that he spoke to Hamilton over the phone after receiving the September 13 letter to discuss closing. Krefting testified that he orally agreed to quarterly interest payments and the separate closing dates, and that he told Hamilton that he was ordering a title report. Hamilton denied ever having such a conversation and, in fact, testified that on September 13 or 14 he and his wife left for a 3-week vacation in California. The trial court made no findings as to whether or not the September 1989 conversation took place. He testified that his next conversation with Krefting did not occur until after January 1, 1990.

Sea-Van ordered a preliminary title commitment on both properties. This title report revealed that the Hellyer property was vested jointly in Clare Hellyer and his former business partner David Syre. The report also revealed that there was a lien to enforce a judgment in favor of People's State Bank in the amount of $60,595.26 against Hellyer, entered in Whatcom County on July 1, 1987. The trial court found that in October 1989, Krefting called Hellyer and told them Sea-Van could not purchase their property since it was encumbered. Hellyer told him that they believed they could clear David Syre's name from the title, but that they did not have the resources available to remove the judgment for $60,595.26. David Syre's name was removed via a quitclaim deed in the spring of 1990.

In January 1990, Krefting called Hamilton to inquire when he would like to close on his 10-acre parcel. Hamilton informed Krefting that he should contact Hellyer, since both parcels had to be sold together, and Krefting had already told Hellyer that he could not purchase their property because it was encumbered. By letter dated February 28, 1990, Marvin Hamilton notified Sea-Van that neither he nor Hellyer were willing to sell their property on the terms set forth in September. Subsequently, he offered to sell Sea-Van an option to purchase the property for $25,000 per acre, which Sea-Van refused. On July 11, 1990, Sea-Van com-

menced the instant lawsuit, asking for specific performance or in the alternative, contractual damages.

A bench trial commenced on April 28, 1992. After the Plaintiff Sea-Van had presented its case, the court granted the Defendant's motion for a directed verdict, holding that no contract had been formed. The terms or subjects that the trial court found were not set forth or agreed to include: the terms of the promissory note, the terms of the deed of trust, the type of deed, the time of closing, and the payment of taxes. The trial court held that the parties did not agree on all the necessary material terms to create a contract for the sale of land, that there was no meeting of the minds, and that the documents presented did not address all essential terms.

Sea-Van appealed and the Court of Appeals reversed and remanded. *Sea-Van Invs. Assocs. v. Hamilton*, 71 Wn. App. 537, 861 P.2d 485 (1993). It found that, because the Defendants had admitted the legal description of the land in question in their answers, these answers supplied that essential element and were sufficient to take the transaction out of the statute of frauds. The court also found that the changes to the offer introduced in the Defendants' September 13 letter were insufficient to find that the parties did not have a meeting of the minds. Finally, the Court of Appeals held that the other silences in the contract were non-essential terms. Hellyer and Hamilton[2] have challenged this Court of Appeals decision, and this court granted their petition for review.

## MEETING OF THE MINDS

Our review of the law convinces us that there are at least two reasons for affirming the trial court. First, the trial court specifically found that there was no "meeting of the minds" between the parties as to some of the essential elements for a sale of land, and, therefore, a contract was not

---

[2]According to the Petitioners' Supplemental Brief, the Hamiltons have "reached an agreement with respondent Sea-Van to settle the dispute with respect to their ten acres and the parties are proceeding to close that agreement." Supp. Br. of Pet'rs, at 1.

formed.[3] The Court of Appeals disagreed, finding that the change to a quarterly interest payment to be de minimis, that a reasonable closing date could be implied and that other missing elements raised by the Plaintiff were non-essential.

"The acceptance of an offer is always required to be identical with the offer, or there is no meeting of the minds and no contract." *Blue Mt. Constr. Co. v. Grant Cy. Sch. Dist. 150-204*, 49 Wn.2d 685, 688, 306 P.2d 209 (1957); *accord Rorvig v. Douglas*, 123 Wn.2d 854, 858, 873 P.2d 492 (1994). Generally, a purported acceptance which changes the terms of the offer in any material respect operates only as a counteroffer, and does not consummate the contract. *Roslyn v. Paul E. Hughes Constr. Co.*, 19 Wn. App. 59, 63, 573 P.2d 385 (1978). However, an acceptance can also request a modification of terms, so long as the additional terms are not conditions of acceptance and the acceptance is unequivocal. *Rorvig*, 123 Wn.2d at 858. If any additional conditions contained in the purported acceptance can be implied in the original offer, then they also do not constitute material variances so as to make the acceptance ineffective. *Roslyn*, 19 Wn. App. at 64. What constitutes a material variation is dependent upon the particular facts of each case. *Northwest Television Club, Inc. v. Gross Seattle, Inc.*, 96 Wn.2d 973, 980-81, 640 P.2d 710 (1981). Normally, the existence of mutual assent or a meeting of the minds is a question of fact. *Multicare Med. Ctr. v. Department of Social & Health Servs.*, 114 Wn.2d 572, 586 n.24, 790 P.2d 124 (1990).

In the case at hand, Sea-Van's offer to purchase was specifically conditioned upon: (1) payment of the balance of

---

[3]Procedurally, the trial court granted the Petitioners' motion for a directed verdict at the end of Respondent Sea-Van's case, before the Petitioners had presented their case. In ruling on a directed verdict motion, a trial court exercises no discretion, but must accept as true the nonmoving party's evidence and draw all inferences favorable to that party. *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 335, 779 P.2d 249 (1989). Appellate review of a directed verdict consists of "review[ing] the evidence in the light most favorable to the aggrieved party and determin[ing] whether the trial court correctly applied the law." *Saunders*, at 335.

the purchase price using an interest only, 2-year note at 10 percent interest per annum; (2) both 10-acre parcels closing together; and (3) proof of clear title by the sellers. Hamilton's purported acceptance added the conditions that: (1) payment on the note be made quarterly; and (2) the two parcels close separately. Because the quarterly payments of interest did not alter the offered interest rate, but affected only the frequency of payments, they may be considered a condition which can be implied in the original offer. See *Roslyn*, 19 Wn. App. at 64. However, Sea-Van's offer was explicitly subject to "both 10 acre parcels closing together". CP, at 108. The acceptance of Hamilton and Hellyer clearly altered this term, and there is no writing which evidences an acceptance on Sea-Van's behalf of this change, nor did the trial court find any oral agreement on this change. The conclusion of the Court of Appeals that a reasonable closing date would be implied ignores the fact that the purported acceptance was conditioned on distinct and separate closing dates.

Additionally, Hellyer was not able to provide proof of clear title, and there is nothing showing that Sea-Van was willing to waive this condition. Instead, the trial court found that Sea-Van's representative contacted Hellyer in October 1989 to tell them that Sea-Van could not purchase the property because of this encumbrance. Were the situations reversed, with Hellyer trying to force specific performance from Sea-Van, the title problems alone would probably be sufficient to terminate the deal. Mr. Hellyer specifically testified that he "considered the deal terminated" because of the problems with title. Report of Proceedings, at 139. The conditions of the offer were not met by the acceptance tendered by Hellyer and Hamilton, thus precluding the formation of a contract.

## MATERIAL TERMS

Moreover, even if we were to ignore the dissimilarity between the conditions contained in the offer and the alleged acceptance, it would still be the case that material terms contemplated by the alleged contract are absent. For

instance, the offer specifically contemplated that the outstanding portion of the debt would be secured by a deed of trust. Although master form deeds of trust are recorded in each county, there are numerous potential provisions which the parties may want to vary, such as late charges, interest on sums advanced by the beneficiary as a result of the grantor's default, due on sale provisions, provisions regarding waste, grantor's obligation to defend actions affecting the collateral, liability clauses, payment of taxes, choice and substitution of trustee, application to successors and assigns, provisions relating to bankruptcy, and attorneys fees. Washington State Bar Ass'n, *Essentials of Real Estate* 3-21 through 3-22 (1989). None of these provisions have been negotiated or agreed upon.

Sea-Van argues that these missing elements are merely peripheral to the formation of a contract for the sale of land. Such an argument ignores almost half a century of precedent. Only last year, this court reaffirmed a 40-year-old decision outlining the 13 material terms of a real estate contract. *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993) (citing *Hubbell v. Ward*, 40 Wn.2d 779, 785, 246 P.2d 468 (1952)). Those terms are:

> (a) time and manner for transferring title; (b) procedure for declaring forfeiture; (c) allocation of risk with respect to damage or destruction; (d) insurance provisions; (e) responsibility for: (i) taxes, (ii) repairs, and (iii) water and utilities; (f) restrictions, if any, on: (i) capital improvements, (ii) liens, (iii) removal or replacement of personal property, and (iv) types of use; (g) time and place for monthly payments; and (h) indemnification provisions.

*Kruse*, at 722 (citing *Hubbell*, at 782-83). Although Sea-Van attempts to distinguish these cases as specific to conveyances involving real estate contracts,[4] this court has never recognized such a distinction, and indeed has specifically relied on *Hubbell* in the deed of trust context. *Setterlund v.*

---

[4]A real estate contract is a specific form of financing "which leaves legal title to the real property in the seller to secure repayment of the purchase obligation". Kristine A. Chrey, "Real Estate Financing", in John G. Bauer et al., *Basic Real Estate Law in Washington* 101, 116 (1992).

*Firestone*, 104 Wn.2d 24, 26, 700 P.2d 745 (1985). "Without the note and deed of trust in the record the court would be attempting to order execution of documents that might contain very material, but unknown terms." *Setterlund*, at 26.

It seems necessary to reiterate once again that negotiation, not litigation, is the proper method for agreeing upon these vital terms. Agreements to buy and sell real estate "must be definite enough on material terms to allow enforcement without the court supplying those terms." *Setterlund*, 104 Wn.2d at 25. The facts of this case demonstrate the very ambiguity which renders an alleged agreement unenforceable. There was no meeting of the minds here as to any of the material terms of the contract except for the price. This is not enough to form an enforceable contract for the purchase and sale of real property. We reverse the Court of Appeals, and affirm the decision of the trial court.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.

Reconsideration denied December 28, 1994.